**JONES et al. v. GAMBILL et al.** (No. 1951.)

(Court of Civil Appeals of Texas. Amarillo. April 12, 1922. Rehearing Denied May 17, 1922.)

1. **Principal and surety** ⬅160—Contracts providing for alterations in building claimed not covered by bond admissible in action thereon.

In owner's action on contractor's bond, where contractor's surety claimed to have been discharged because of delay in completing building, causing damages, was occasioned by breach of subsequent contracts not covered by the bond, contracts providing for installation of elevator and a change in position of joists *held* admissible.

2. **Principal and surety** ⬅100(4)—Surety held to have consented to supplementary contract authorizing alterations.

Where, in owner's action on contractor's bond, because of contractor's refusal to complete building according to alterations stipulated in subsequent contract, the right to which was reserved by owners in original contract, *held*, that the stipulations in original contract permitting alterations constituted consent in advance on the part of surety, and it was not discharged from liability thereon.

3. **Principal and surety** ⬅82(2)—Surety held liable for breach of contract made contemporaneously with original contract covered by its bond.

In owner's action on contractor's bond, where contractors refused to install an elevator provided in contract executed contemporaneously with original contract under a stipulation reserving to the owners the right to make changes when indorsed by them, *held* the contractor's bond covered the contract as evidenced by the two instruments, and the surety was liable thereon.

4. **Damages** ⬅78(4)—For delay in completing building held recoverable.

Where contract for execution of building provided for payment by contractor of an agreed sum per day after time fixed for completion of building, and where it was shown that it was through no fault of owner, who was shown actually damaged, that the building was not completed within the time fixed, the provision for payment of the amount fixed, by contract, although construed to be a penalty, was enforceable.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Action by Levi Gambill and others against J. C. Jones and others. From a judgment for plaintiffs, defendants appeal. Affirmed.

Melvin E. Peters, of Wichita Falls, and Burgess, Burgess, Sadler, Chrestman & Brundidge, of Dallas, for appellants.

W. B. Chauncey, W. J. Townsend, and Carrigan, Montgomery, Britain & Morgan, all of Wichita Falls, for appellees.

HUFF, C. J. Jones & Lane, contractors, entered into a contract with Geo. B. Ray, Levi Gambill, and W. B. Chauncey to erect a two-story brick building on lot 3, block 151, in the city of Wichita Falls, according to certain plans and specifications prepared by W. Roberts, architect. "Said plans and specifications, together with this contract, of which they are deemed a part, are to be construed together," etc.

The general specifications called for in the contract stipulate, among other things:

"All estimates or orders, or charges, entries and credits, extensions of time, and other matters of record, pertaining to the building, must be executed on regular forms and by the architect.

"*Changes of plans.*—The owners reserve the right to make changes during its progress, without affecting the contract or bond. All such changes to be on regular forms of the architect and duplicate copies to be attached to the contract and bond. No changes shall be recognized in final settlement unless ordered in writing by the architect or indorsed in writing by the owner, with the costs or credits stipulated thereon.

"The owners agree to pay the contractors in semi annual payments, the total sum of $19,-740.00, and upon completion, and before final settlement, the contractors, if required by the owners, were to furnish evidence as to the freedom from all liens for debts due or claimed to be due."

The Massachusetts Bonding & Insurance Company executed a bond as surety for the contractors, payable to the owners, in the sum of $9,870, or persons who may furnish material or perform labor on the building contemplated. The condition of the bond is that, if the contractors shall keep and perform the covenants, conditions, stipulations, or agreements to be kept and faithfully fulfilled by them as set forth in the contract above mentioned, dated the 30th day of September, 1919, for the construction of the work, building, or improvements mentioned in the contract, and pay the sums as provided therein, and any and all damages or forfeitures, etc., under the terms of the contract by reason of malfeasance or nonperformance on the part of the contractors, and if the contractors shall properly make payments to all persons, supplying them labor and material in the prosecution of the work provided for in the contract, then the bond shall be null and void, etc. The bond bears date October 1, 1919.

A supplemental contract bearing date September 30, 1919, the date of the original contract above referred to, made between the owners and contractors, in which it is recited it should be construed in connection with and as an addition thereto, the owners stipulating therein they would purchase and have installed an elevator in the building and furnish the feed wires therefor, and the contractors should prepare elevator shaft and do all work in the construction and in connection therewith for the installation of the elevator, and, if necessary, prepare a pit and penthouse for the elevator, should it require the same, and the compensation mentioned in the contract above referred to should cover the compensation of the contractors in the contract then executed. This additional contract was signed by the owners and the contractors. On the 15th day of October, 1919, an instrument was executed reciting the making of the contract of September 30th, and that it was the desire of the owners and contractors to make certain changes, providing therein "to change all joists as set forth in plans from a transverse

position to a longitudinal position, as fully set forth in the drawing," giving the specifications for constructing the transverse beam, the owners agreeing to pay the additional sum of $707.05 on account of the change. This instrument was signed by the owners and contractors, and indorsed by W. Roberts, architect.

On February 3, 1920, the owners, the appellees herein, instituted suit on the contract and bond above set out, and by amendment filed December 13, 1920, alleged: That on February 3, 1920, Jones & Lane refused to erect the building in compliance with the terms of the contract, and refused to prepare a pit and penthouse for the installation of the elevator, and that the owners notified the appellant bonding company of the failure and refusal of the contractors; that the bonding company refused to complete the building, ignoring appellee's request for it to do so; that the contractor would neither complete the building nor permit appellees to do so, and thereupon appellees filed suit and procured the issuance of an injunction against appellant contractors from interfering with appellees in completing the building, and upon the issuance of the writ the appellees entered upon the premises and completed the building at an actual cost above the contract price of $779.41. At the filing of the suit there was unpaid on the contract due by appellees the sum of $5,-657.05, which the appellees then filed with the clerk of the court. They also alleged, by reason of the failure of the appellants to complete the building on December 10, 1919, the date fixed by the contract for its completion, appellees sustained damages in the sum of $1,375, or at the rate of $25 per day from December 10, 1919, to February 4, 1920. They allege that the sum of $779.41 was the reasonable and necessary sum expended in completing the building in accordance with the plans and specifications. It was also alleged that appellees, before entering into the contract with appellants, had entered into a contract with one Cochran for the rental of the building after it was completed, at a price of $25 per day, and that Cochran stood ready and willing at all times to take possession of the building as soon as it was completed. It was also alleged by the amendment that the intervener Alfalfa Lumber Company, was making a claim that it furnished material to the contractors for the building in the total sum or price of $5,175, and that the Wichita Builders' Supply Company was claiming it had furnished the sum of $619.57. The prayer was for judgment for the two items above set out, and that the amount be deducted from the sum of $5,657.05 held by the clerk, and unpaid on the contract price, and prorated among the interveners.

The case was tried before the court with-

out a jury. In the judgment the court recites his findings of fact. He finds: On September 30, 1919, the execution of the building contract to build the structure described in the petition, at the contract price of $20,457.05. That appellees paid on the contract the sum of $14,800. Before the building was completed the contractors refused to complete the building in accordance with the contract, and thereupon appellees filed suit and obtained a temporary writ of injunction to prevent the contractors from interfering with the appellees in the completion of the building. That appellees deposited with the clerk $5,657, the balance due on the contract price. Upon the failure of the contractors to complete the building appellees notified the appellant bonding company of such refusal, and that the bonding company refused to complete the building. The appellees thereupon took the building in charge, and expended the reasonable and necessary sum of $760 in completing the building according to the terms of the contract. That appellees were further damaged in the sum of $1,375 on account of the appellants' failure to complete the building by December 10, 1919. He finds the intervener, Long-Bell Lumber Company (successor to the Alfalfa Lumber Company), furnished the contractors material for the building amounting to the sum of $5,173.05, which amount is due and unpaid; that the Wichita Builders'· Supply Company furnished material to the contractors on the building, and that there is a balance due thereon and unpaid the sum of $619.15; that on October 1, 1919, the contractors, as principal, and the Massachusetts Bonding & Insurance Company, executed and delivered their bond in the sum of $9,870 to secure the faithful performance of the above-mentioned contract, upon which facts the court entered judgment, and from this judgment the contractors and the bonding company appeal.

The plea of the bonding company, which is filed in connection with that of the contractors, we believe should be noticed at this time. It is alleged therein that it became surety for Jones & Lane under the terms and conditions of the contract of date September 30, 1919; that thereafter appellee and the contractors, without the knowledge or consent of the bonding company, entered into two separate contracts, "materially modifying and affecting the original contract of September 30, 1919"; that one contract provides in addition to the work required in the original contract the preparation of an elevator shaft, also pit and penthouse for the elevator; that it was entered into without the knowledge of the bonding company, and as "entered into so modifying said original contract subsequent to the 1st day of October, 1919, although it purports to be dated the 30th day of September"; that

on the 15th day of October, 1919, another written contract modified the original contract, without its knowledge or consent, but the modifications are not set out in the pleading; that by the terms of the bond it became surety "to the extent of the principal amount of said bond to indemnify the plaintiffs as to the work to be performed in said original contract, but not as to any work to be performed under any modification or change in said contract imposing additional burdens upon the defendants Jones & Lane, or defendant Massachusetts Bonding & Insurance Company"; that all damages now sought grow out of the modification of the original contract and not because of delays or damages growing out of the original contract, and which, if the contractors had only been required to perform, there would have been no damages.

It is contended the contract for the elevator was not signed up until the 3d day of October, after the bond sued on was signed, and that this is uncontroverted. We hardly think the evidence will justify us in finding such evidence is uncontroverted. It is true Mr. Jones so testifies, but one of the appellees, Chauncey, testified that the plans and specifications planned by the architect called for an elevator, but they were not fully decided upon which kind they would select. His evidence is subject to the interpretation that in fact the two contracts were signed at the same time. "The contract with reference to preparing the building for the installation of the elevator was prepared by me and it was signed up by Jones & Lane, through J. C. Jones, and by myself as one of the owners, and this contract, together with the original contract, was taken by Mr. Lane, he at the time telling us that he wanted to hurry up and get off on the 2 o'clock train, as he could go to Dallas, transact some business and get back at once." We are inclined to think the evidence will justify the finding the contract termed "original" and the elevator contract above set out were contemporaneous instruments. Mr. Jones does say the contract was not drawn at the time the original was. He simply says it was not signed until the day after he got back from Dallas. It seems he brought with him or delivered the bond on the 2d day of October. Whether he delivered them together is not made plain. We are not referred to any evidence where the bonding company did not see the contracts before it executed the bond, or knew of them. It may be in the record, but we have not been able to find it.

Assignments 1, 2, 18, 19, 20, 21 and 22 all relate to a change in the original contract by the owners and contractors, without the consent of the surety, the bonding company.

[1, 2] The first assignment relates to the introduction of the contracts relating to the

elevator and the change in the joists. There was no error in receiving them in evidence, especially as to the contractors. It is asserted by assignment and proposition that most of the delay causing damages, and for extra work, was occasioned by the subsequent contracts. In other words, that these were independent contracts, and not such as the bond covered. This was particularly stressed by able counsel in an oral argument upon the submission of the case as to the elevator contract. In the brief of appellants in part at least, it seems to be the theory, as article 5623a, R. C. S., has been declared unconstitutional, as interfering with the freedom of the right to contract, that the surety in this case should be discharged. It is perhaps true under the holdings of the courts declaring the statute unconstitutional that, if there was no agreement authorizing the change by the owner and contractor, the surety would be relieved. The rule is stated, in the absence of a statute, as follows:

"It is well settled that, if the contract between the owner and the contractor permits alterations to be made in the work to be done, or if the bond itself permits the alteration, the surety will not be discharged by reason of material alteration made without his express consent, when such alteration is one contemplated by the terms of the stipulations permitting alterations. This rule is based on the doctrine of prior consent by the surety, it being held that the stipulations permitting the alteration constitutes consent in advance on the part of the surety to such alterations as are within the terms of the stipulation." 21 R. C. L. "Principal & Surety," par. 60, p. 1012; Bonding Co. v. Rosenberg Independent School (Tex. Civ. App.) 195 S. W. 298; Bonding Co. v. Elliott (Tex. Civ. App.) 195 S. W. 301.

The case relied on by appellant we think supports the above quotation. Williams v. Baldwin (Tex. Com. App.) 228 S. W. 554.

We think there can be no question but the contract with reference to the joists falls under the general rule, as the specifications specifically provide that the owners reserve to themselves the right to make changes. The contract seems to have been indorsed by the owners in writing, and otherwise approved by the architect as required by the contract.

[3] As to the installation of the elevator, there may be more doubt whether it is a change of the provisions of the terms of the original contract or whether it is a contract for independent work which would not release the surety, and, doubtless, if it were such contract, would not render the surety liable for the extra work or for delay occasioned thereby. It may be stated as a general proposition, a surety is not discharged by an independent contract between the owners and the contractors, although it be made contemporaneous with and relate to the same subject as the surety's contract,

without varying the terms thereof. To discharge the surety such variation must be made within the terms of the contract by which the surety is bound. 21 R. C. L. "Principal & Surety," § 55, p. 1006. There may be some difficulty in determining in this case whether the elevator contract changed the terms of the contract originally drawn, or whether it is an independent contract. The appellants, contractors and surety have alleged it to have been such as modified, changed, and affected the original contract; that the bond was given to indemnify the owners in the work to be performed under the original contract, "but not as to any work to be performed under any modification or change in said contract." So it is made reasonably certain the surety alleges the elevator contract was a change in the terms of the original contract. We think the trial court was therefore justified in holding, if it was in fact a subsequent agreement, that it only went to the extent of changing the terms of the original contract. He could, it would appear, place the same interpretation on it that the surety did. This being true, under the original contract the owners had stipulated that they reserved to themselves the right to make changes when indorsed by them. The rule above stated from Ruling Case Law will apply to the elevator contract under the pleadings and holding of the trial court.

Again, as suggested in our findings of fact, the court was justified in finding the original and the elevator contract were contemporaneous, constituting one contract, against which the surety would indemnify the owners. The elevator contract expressly provides it should be construed in connection with and in addition to the main contract. It is not shown that the surety did not know of the existence of the latter agreement when it executed its bond, and that it only intended to secure the performance of the main contract, and not the elevator contract. The facts will warrant a finding that when the bond was executed it was on the contract as evidenced by the two instruments dated September 30th. We therefore overrule the assignments.

Assignments 3 to 16, inclusive, relate to the introduction of evidence to establish expenditures on the building after appellees took charge to complete under the contract. The appellants seem to have objected to every item or testimony as to each item, on the ground, generally, that it was not shown that such items had gone into the building, or that they were necessary, and the like. Objections were also urged to the estimate made by the architect as to the work and material necessary to complete the building. It is also urged the evidence as a whole does not support the findings of the court for the amount expended and necessary to com-

plete the building, which appellees expended. It would be an interminable task to examine each item, the objection made, and to give reason for its admission. It will be sufficient to state the trial court's finding has support in the evidence, and no material error is shown in admitting the various scraps of evidence to which objections were made.

[4] The seventeenth assignment assails the judgment of the trial court for damages for delay, $1,375, on the ground that it is shown the delay was occasioned by failure to install the elevator which the appellees were to furnish, and that it was through their fault that it was not sooner installed; that without it the upper story could not be used, and that, after appellees took charge, the rent, on account of not having the elevator, was only one-half the rental contract, or $12.50 per day. It is also asserted the cause for damages for delay is a penalty, and not ascertained damages. The stipulation in the contract is as follows:

"The contractors shall prosecute the work speedily and continuously after the approval of the bond and contract, and the entire work covered by this contract shall be finished by December 10, 1919. The damages for default are fixed at $25 for every day thereafter that said work shall remain unfinished, but should contractor finish ahead of this guaranteed time limit the owners shall allow them $10 for each and every day said work is finished ahead of said time."

We interpret the provision in the contract as a penalty, and not for liquidated damages. In this case, however, the appellees established by the evidence their damages were $25 per day from and after December 10th. They entered into a contract with one Cochran to lease the building for a term of three years before the construction contract was executed, but in contemplation of the erection of the building. The rental was $750 per month or $25 per day. The lessee, by the rental contract, was to take possession as soon as the building was completed. He was ready, willing, and able to take possession of the building on the 10th day of December, 1919, but the building was not then ready for occupancy, and not completed. The trial court assessed the damages for 55 days at $25 per day; that is from December 10, 1919, to February 4, 1920, when appellee secured possession of the building. The facts otherwise justify the finding for that amount. Under the contract and the evidence the appellees have established their damages as found by the court. It is insisted, however, that, as the appellees were to procure the elevator, and it was not installed until about one month after the tenant took possession on February 4th, and as that tenant only paid for that month $400, and the appellees took off $350 for that time on account of being unable to use the upper story for lack of an elevator, this conclusively established that the damages actually sustained were only $12.50 or $13.33⅓ per day. As we view the case, the court might with propriety have assessed $350 more than he did. The facts were sufficient to show the contractors were not to any appreciable extent delayed on account of bad weather or shipping facilities, or at least the court was justified in so finding. The building was not ready for the elevator until after the appellees took charge and made it ready. At the time the building was to have been completed, December 10, 1919, the roof was not on the building, much less the penthouse. The contractors never did construct the penthouse, and they were in charge of the building up to February 3, 1920. In fact, they had roofed over the opening made for the penthouse, through which the elevator was to work, and refused to construct it. The pit for the elevator was such as could not be used, and had to be reconstructed. The building in several particulars was not ready for use or completed by December 10th. The evidence is sufficient to justify the finding that it was the contractor's fault that the building was not completed by December 10th or by February 3d, and that it was necessary for the appellees to take charge. The evidence does not show, or at least the trial court was justified in finding, that it was not on account of the failure of the apppellee to procure the elevator that its installation was delayed, but the evidence would indicate that it was on account of the contractor's fault in not having the building prepared so it could be installed. This assignment will be overruled.

The above will dispose of the eighteenth assignment, except that portion thereof considered under the first and other assignments.

The appellants on oral argument suggest that the judgment against appellants amounts to a double recovery. We have examined the judgment with this particular matter in view, and have concluded that it is not a double recovery. The judgment perhaps is not in the usual form, but the appellants suffer no harm from its terms. It would seem the only parties who could complain at the distribution of the money deposited with the clerk would be the interveners, the materialmen, and they are not complaining in this court.

The judgment will be affirmed.